It looks like you made it to our Pasadena courthouse, so I'm glad you were able to get there safely. Is that Mr. Gunn? Yes, Your Honor. Some good news. I saw the sun peeking through the clouds just a few minutes ago, but apparently it's disappeared again. My name is Carl Gunn, Your Honor. I'm representing Mr. Hackett. I'm going to try to reserve three minutes of time for rebuttal, and I'll try to keep track to the extent I can. Your Honor's got a whole flood of letters on the intended loss issue on supplemental authority, but there are a couple of issues I'd like to flag and talk about before I get to that, assuming Your Honor's also want to talk about that. One is a trial issue that the government says is quote, measly unquote, but it really isn't. That's the exclusion of the defense text message exhibits. The other is the role on defense issue, which really had an equally big impact on Mr. Hackett's sentence. Three points on the defense text message exhibits. First, this was not measly evidence. Think about what it showed. Part of this conspiracy and the claim that one of the government witnesses expressly made was that press releases were given to the conspirators before they went public. And here you have Mr. Hackett saying, I don't want to see them. That is not measly evidence, Your Honor. That is extremely powerful evidence. Well, was it hearsay though? No, it was not hearsay, Your Honor. And let me address why it wasn't hearsay. There were three types of statements here. One was Mr. Hackett asking, have these been made public yet? That's not even a statement. That's just a question. A question is not an assertion of fact, which is what a statement has to be. Second, the second type of statement was Mr. Hackett saying, I don't want to look at them if they haven't been disclosed yet. That's pure state of mind. That's saying what I want in my head. The third type of statement, Your Honor, is straight out of the advisory committee notes and my law school casebook long ago. It's the Hillman case. It says, he made a statement that I will look at them tomorrow morning. That's a statement of intent to do a future act, which the Hillman case, an old Supreme Court case that the advisory committee notes cite with approval say, is a state of mind exception statement. So these were not hearsay statements, Your Honor. They were not hearsay statements. They were extremely powerful evidence. I'm sorry, Your Honor. Sir, what is the relevance of this? The main argument the government makes— Just a minute. May I finish, please? I'm sorry, Your Honor. I didn't hear you. Because the charges here are not about—this is essentially about insider trading. And the charges are not about insider trading. Well, but part of the conspiracy, Your Honor, was these press releases with company information being given to conspirators earlier, before they were made public. So that was part of the conspiracy. The government wants to make the argument, well, oh, well, maybe he didn't participate in that part of the conspiracy, but still the others. But that's not the way conspirators usually work. I think the more plausible argument, which the defense could have made, is if he's not going to participate in that part of the conspiracy, he's not going to participate in the others either. Now, the jury would have to decide what to do with that. But I don't think you can say this. This evidence was actually very powerful because it showed he wasn't willing to do one of the things that was part of the conspiracy. So you're right, Your Honor, that there was more to the conspiracy. I'm sorry. Wasn't there a record that he was involved in putting together these press releases, sub-press releases? It could be that he didn't want to look at the particular press release that was being released, but what does that have to do with whether he was promoting the press releases? Well, Your Honor, it wasn't really press releases. There was an inference the government argued that these certain, they were like these email newsletters with other people purportedly touting the stock as great, not the company itself releasing information. The government claimed those were tied to Mr. Hackett, but that was something the defense could certainly argue against. The way the government tried to tie it to Mr. Hackett was he paid money to the company that ended up putting out those email newsletters, but the payments didn't match the cost of producing the newsletters in terms of amounts, and the timing didn't match. So the defense certainly had an argument that Mr. Hackett was not, in fact, responsible for those. That argument would have been strengthened by the defense being able to point to this other part of the conspiracy that he was clearly not wanting to participate in. Now the government does make an argument that, well, there's no mention of this specific stock in this case, but that's just the argument for inference. It certainly, you had one of the same conspirators who was talking to him about it. It was in the same timeframe. The government itself argued a similar inference when he talks about this Ms. Milhouse who ran the call rooms. The government, there's no mention of the specific stock there, but the government argued the inference that it must have been. I can move on. I'll talk a little bit, if I could, about the role and offense issue, Your Honors. The district court doesn't have to make findings about role and offense, but it made a really important finding here. It found Mr. Hackett was, quote, not telling people what to do with respect to the criminal activity, unquote. That's sort of saying he's not a leader in the offense, and really not an organizer either. I mean, in theory- These are two different things, right? Seems like he wasn't a leader by the district court slides, but the issue is, was he an organizer? Right, and there is a distinction, though I think they're related. I think when you make that finding, it becomes harder to argue the organizer idea. And there's really nothing the government points to, Your Honor, about- Remember, he has to organize participants, not activities. That's the line that's drawn in the Holden case. And everything the government points to is really either coordinating with someone else. They point to these emails and exchanges he has with Ms. Milhouse, who was running the call rooms, but those just show he was coordinating with her. In fact, at one point, she says, I don't use all my call rooms for your work, showing she's certainly independent, and he's not telling her what to do. All he's basically doing is telling her, this is the price I'll pay, and she's then saying, okay, I'll try to get that price. So I don't think that's organizing. Another thing the government points to is setting up a phone call. I mean, people ask their secretaries and assistants to set up phone calls all the time. That doesn't make the secretary or assistant an organizer of participants. It's organizing the activity, maybe organizing the phone call. And then there's this ambiguous, he was, quote, running the deal, unquote. But I would submit to your honors that running the deal means activities, not participants. There's no participant. There's nothing the government points to where he was either telling someone what to do or even organizing what they did. And remember, this all got started before he even comes into it. I mean, he's not even in the vast majority of the earlier phone calls. I do want to get your perspective on the intended loss issue. All right. I was just about to get there, your honor. I think what I would start with is the simple statement by Sixth Circuit Judge Murphy that I quote in my response to one of the government supplemental authority letters. Loss means loss. If someone came up and tried to grab my wallet out of my pocket, but I slapped their hand away, they didn't get it, I wouldn't say I lost my wallet. And I just don't think there's any way to say intended loss or tempted loss comes within the actual word loss. Now, maybe if plain error applies here, I admit I have a harder argument because you have a split in the only two circuits that have actually addressed the merits of the issue. But there was a sufficient, first of all, there's case law in this circuit that says if it's a legal issue, it can be renewed de novo with no objection at all. And second of all, you have a sufficient objection here, at least to preserve the claim. The defense didn't have to make this specific argument about Kaiser and Stinson. All I had to do was make the general claim. And what you have here is first you have an objection to the quote methodology unquote, and then you have another objection. And I'd like to flag this for the court. I didn't flag it a second time in my supplemental authority letter, but I did flag it in the briefs. The objection orally at sentencing was, quote, the actuality of what happened here was, I think, even more important, unquote. I think that's enough to preserve the idea that the judge shouldn't be sentencing based on speculative intended loss and should be looking at what actually happened. So I think there was sufficient preservation here. I've tried to address at length. I think Judge Murphy's concurring opinion in the Sixth Circuit Kenner case, where he disagrees with the Yu case, really lays out very effectively why the Yu case is wrong and the Pence case is right. Two things. First of all, what is this $4 figure? In other words, in what sense was it? Let's assume that intended loss, in some sense, works. I want to get back to whether it does, and I think it's a fair question. But the $4, did he actually sell the stock, but he didn't get the $4 he meant to get? Or were these stocks he never actually sold, although he meant to sell them? Or what exactly? The $4, there is a point in one of the recorded calls where Mr. Hackett is saying, let's target $4 to $5 per share. So I think that's where the $4 to $5 comes from. I know, but what I'm asking was, was this based on shares he actually did sell, but he didn't get $4? Or is it things that he meant to sell, but he never did sell? Or what exactly? Well, the government's argument is that that's what he was trying to go—the government's argument is that is what he and the others—is what he thought he and the others should try to do. I don't think there's any evidence— You're not answering my question. I mean, in other words, it seems to me to make some difference as to whether it's an intent, a loss, whether nothing happened or something happened, but it didn't turn out the way he thought. So did nothing happen? Did he not sell the stock at all? Or did something happen, but he didn't get the $4? Some shares did get sold. If you look at the government— Some shares got sold, but what are the—all right, you don't seem to be able to answer my question. No, I do, Your Honor. If you look at Supplemental Excerpt of Record 278, the government's excerpt of record, they identify $361,481 of shares that were sold, and they give you two total amounts. If you add those two total amounts and divide them by those number of shares, you come out with average sale price of $119 per share. There's also the other thing I noticed in the facts in the defense— If you made it $4 a share for that same number of shares, it would be the amount of intended loss that was imposed? No, because the judge used 550,000 shares, which is what I believe a defense sentencing memorandum conceded Mr. Hackett either owned or sold. But interestingly, that was the next fact I was going to get to, Your Honor. The defense sentencing objections are not in the excerpts, but it's CR 389 in the district court docket. 350,000 of those shares were received by Mr. Hackett, according to the defense sentencing memorandum, from a Robert Farrell on March 16, 2018. And if you look at the—there's a government exhibit. I forget the exact number, but it's in the 600s, and it's in the—I believe in the excerpts. It shows the way this price tracked. The price of the shares after March 16 was never any higher than $0.25 a share, so that would suggest those 350,000 shares, assuming they were ultimately sold, didn't get sold for more than $0.25. So to answer Your Honor's question, I think the record suggests very strongly that there was never anything close to a $4 or $5 price for at least the vast majority of the shares that were sold. Well, but that's not—the issue that's been presented to us on appeal isn't the way the intended loss was calculated. I think that was an objection raised below. Now the argument is you just can't consider intended loss at all. That's correct, Your Honor. I was just trying to answer Judge Berzon's question. I was just interested because it seemed to me that it throws some light on what intended loss might mean. All right. So my other question is, if you had the loss provision standing alone, you'd be in an extremely strong ground to my mind. But the question is, how does 1B1.3 factor into this, which as a matter of cross-referencing says all harm that resulted from the accident emissions and all harm that was the object of such accident emissions? But if you look at 1B1.—I mean, I make the argument, Your Honor, and I would stand by that, that the problem is the word harm that comes before says harm without the qualification of intended harm. But even if you think that's ambiguous, it's pretty clear if you look at the commentary, Your Honor, which I quote in my reply brief, it basically refers to 2X1.1, the Guideline for Conspiracies and Attempted and that kind of thing. So I think that any reference that that relevant conduct guideline is read as making to intended loss or intended harm, it's basically saying, yeah, that's for purposes of applying 2X1.1. Because in 2X1.1, you look at intended harm. Or in co-ed crimes, essentially. But where is it? Let me look in my reply brief, Your Honor, and give you that application note. I don't want the reply brief, but I want to know where this cross-reference to 2X— The application note that I'm referring to, Your Honor, was—I'm sorry, let me—it's application note 6B to 1B1.3. It says, the extent to which harm that was attempted or intended enters into the determination of the offense level should be determined in accordance with Section 2X1.1 for attempt, solicitation, or conspiracy and the applicable offense guideline, which is cross-referenced by 2X1.1. So I think fairly read, however you read 1B1.3 is saying you look to attempted harm or intended harm. They're talking about you then go to 2X1.1, which talks about using intended or attempted harm. I see I'm over my time. It'd be nice if I could get some for rebuttal, but— You will have it, yes. We'll give you two minutes for rebuttal. Thank you, Mr. Gunn. Let's hear from the government. Thank you, Your Honor. May it please the Court, Zach Howe for the United States. I can begin with intended loss, and it might be helpful to begin with the standard of review in the event it does some work here. As I understand, my friend, on the other side, there are essentially two arguments for why you wouldn't apply plain error review. One is that there was a sufficient objection below, and the second is that even if there wasn't, you would be applying this pure legal issue doctrine. I'm happy to address both of those. Opinion in United States v. Kirill Yak, if that's how you say it, 29F4-1128, which seemed to have a similar—it eventually decided a question similar to this one, although not the same, and it seemed to say that as long as there was an objection to the application of the loss provision, the fact that the argument changed didn't matter. So the big difference between this case and Kirill Yak is that in Kirill Yak, in the district court, the defendant objected to applying the specific commentary at issue, and there it was a loss amount applied to each individual credit card that was stolen. And then on appeal, it was an objection to that very same commentary. It was just slightly different grounds, and so this Court— I thought it was on appeal, it was an objection to the $500 per se amount. That's correct, and as I understand it— So it has to be a fairly similar relationship between the arguments. That's correct, but as I understand it, that same objection was raised in the Court below. It was just a different argument as to why that $500 shouldn't apply. That's very different than what's going on here. Here, if you look at page 16 of the record, Hackett agrees that intended loss applies. The district court says, you know, the guidelines say intended loss, and Hackett's counsel says, yes, intended loss, but there are different ways to measure intentions. So below, he's agreeing that intended loss applies. He's just quibbling with how to calculate intended loss. Here, he's asking that you don't calculate intended loss at all. So this is not a different argument. This is a different claim entirely, and it would result in different relief because you'd be calculating a different type of loss, which would result in a different loss enhancement and different guidelines range. So this is an entirely different claim. So this is not the Karoljuk bucket. And that only leaves the question, well, if he didn't preserve this argument, then can we still consider it under this pure legal issue exception? And the answer is no for a few reasons. The first is that even if this is a purely legal issue, in application, it would be extraordinarily fact-bound because you're talking about calculating actual loss, which spans, you know, dozens of transactions, and you have to figure out the price and, you know, what it would have been worth. And as the government stated at Supplemental Excerpt of Record 277 and 78, it wasn't actually able to calculate the entire actual loss because of Hackett's use of nominees and offshore brokerage accounts. So the best it could do, it calculated a little over $300,000, but it said that's fragmented and incomplete. So the government would certainly suffer prejudice if this pure legal issue exception to Plain Error Review were a problem. Well, the only prejudice would be, I mean, it's more a judicial efficiency argument that if the district judge had adopted this, the Hackett's view, then it would have calculated the actual loss. And since the argument wasn't made, now we have to decide it in the first instance and send it back. But the fact that it's going to have to be done isn't a reason. The fact that it may have to be done on remand might be a reason. So, Your Honor, I think it's a reason to conclude that this is not a purely legal issue, at least in the practical sense, because even if you decide, you know, just the legal issue of whether the commentary applies or not, then in practice, it's not as easy as sending it back to the district court and saying, you're applying a plus eight instead of a plus 12 now. No, it's an extremely fact-bound determination that can't even be done because of the way these transactions were structured. Why don't you just give us your argument on the actual legal issue? Because your friend argues loss should mean actual loss, and you disagree. So why don't you spell it out? Sure. So if you get there on de novo, then I think that Banks misread those dictionary definitions that it was citing, and it failed to look at context, structure, and purpose, which Kaiser says you have to do. So beginning with the actual dictionary definitions of loss, the various Merriam-Webster's addition definition of loss that Banks cite confirmed that loss can mean what you didn't gain. And of course, in a zero-sum game like what we're talking about here, what Hackett didn't gain was what investors didn't lose. That's intended loss. I'm sorry, I really don't understand what you're saying. What he didn't gain is what they didn't lose. Well, of course, if he didn't gain it, they didn't lose it, but what is that proof about what loss is? Sure. So I think that proves that the plain meaning of loss can include intended loss. So to just put this in concrete terms, what Hackett didn't gain is that $4 or $5 per share sold. And the $4 or $5 that he didn't gain is the $4 or $5 that the person who would have bought the share didn't lose. So under the plain meaning— It was all up in the air, and there was no loss in either way. Nobody gained it, and nobody lost it. I don't understand. And that's exactly why it's intended loss. It's just completely air. It's air. It's air? It's air. It's hypothetical. It didn't happen either way. It didn't happen as a loss, and it didn't happen as a gain. I agree with that, Your Honor, and I think that's the distinction between actual and intended loss. But I do think that the fact that the plain meaning of loss can include what you didn't gain suggests that the plain meaning of loss can include intended loss, or at the very least, that it's ambiguous, in which case you defer to the commentary. But even setting that aside, Kaiser says you have to look not just at text but also at structure and purpose and context as well. And the Third Circuit didn't do that. In fact, it said in context, loss can mean intended loss, but then it didn't actually explore any of that context. The U case from the Sixth Circuit, which agrees with us, did explore that context, and we think it got it right. And we point to a number of different contextual clues. One is a provision of the guidelines that we think is a standalone reason to affirm, but that would also show context here, and that's 1B1.3. It says that you, when determining relevant conduct, look not just to harm caused by acts but to harm that was the object of acts. And what about the suggestion that the language means when the intended harm is an element of the crime? In other words, harm still means harm. It doesn't mean something that didn't happen unless the crime is for attempt or conspiracy or solicitation in which the harm doesn't have to have occurred. It's pretty clear, actually, the sentence. The extent to which the harm that was attempted or intended enters into the determination of the offense level should be determined in accordance with 2X1.1. And the attempt, solicitation, or conspiracy provisions is that you reduce by three levels when it's not actual harm but intended harm. Sure. So, I think you're referring to the guidelines commentary that my friend on the other side quoted a minute ago. Which makes sense. Otherwise, that provision doesn't make very much sense on its own. It's hard to say what harm that is the object of such acts and omissions mean except when that is relevant to the crime of conviction. Right. So, maybe just to kind of unpack that commentary, I think the distinction being drawn is not the one that my friend on the other side draws. It's not a distinction between actual and intended harm. It's a distinction between risk or danger of harm and actual or intended harm. And you can tell that from the first two sentences of that commentary. The commentary says that when the crime involves a risk or danger of harm, then you include that as part of the harm in the base offense level. And it gives some examples. So, for example, I think the first provision cited is the arson provision. Obviously there, if you're burning down a structure, then it's relevant whether there's people inside. You might be creating a risk or danger. And therefore, you're talking about a risk or danger that needs to be included in the definition of harm. But then the second sentence of that commentary says that it's different when you're talking about a provision that only deals with actual or actual and intended harm. And then when it says actual and intended harm, it actually cites 2B1.1, the very provision we're dealing with here. So, that guidelines commentary expressly says that 2B1.1 includes intended loss. So, it's not drawing the distinction that my friend on the other side says. It's actually strongly supportive of our position. And, of course, if you go back to the guidance— I take it just to reframe what you're saying, so I make sure I'm understanding it. You're saying, well, intended loss is a metric for examining loss in the context of inchoate crimes, but it's not limited to those types of crimes. I believe that's accurate, yes. And the one other point I want to add to that, though, is, you know, you can abstract away from all of that commentary and simply go back to the actual text of the guidelines because, you know, you don't want to get into another Kaiser issue by looking at the guidelines of 1B1.3, just looking at the text of the guidelines. It says harm caused by the acts, but also harm that was the object of the acts. Drawing that distinction means it's not just talking about harm. It's talking about harm that was the object of the acts. I was going to ask, you touched on this a moment just briefly, but a second ago, which is, you know, if we're going to look at the guidelines commentary, it seems that we either have to look at all of it or none of it because we're being told we can't look at the guidelines commentary on loss, and that clearly says that intended loss is part of loss, so we're told let's not look at that. But then all of a sudden, we have to look at the guidelines commentary again for something else. It seems that we have to be consistent. And that's why I say begin with the guidelines themselves for 1B1.3. That says harm caused by the acts or harm that was the object of the acts. Harm that was the object of the acts is not harm that was realized. So that's intended harm. So that guideline itself gets you to intended loss when you get to the loss context, and to determine loss. So how, I mean, what this intended loss is, you know, if somebody is sitting around thinking, gee, I'd really like to cause this loss, is that good enough? Or what is it that we're supposed to be looking at? That's why I was asking the questions before about exactly how this is connected up. I mean, if he, for example, sold stocks and meant to be getting $4, but he, in fact, miscalculated and he got $2, that's one thing. But if he never sold it at all, it seems that's like another thing. So which category are we talking about here? So our argument at trial was that he was intending to sell about 900,000 shares. He didn't actually succeed. But because he had the intent to do so, you could include that. The district court took a more conservative approach and said, I'm only going to use the And by defense counsel's estimation, that was $550,000. So the court used $550,000 and then it used the number that he intended to sell the shares for, even if he didn't ultimately get that amount. Meaning one day he was sitting around saying, I'd like to get $4 for this or what? I believe that's right. And it didn't actually happen. Now, our position is, look, intended loss means intended loss. Intend to sell this amount of shares for this price and are simply thwarted in doing so. The problem is that that's not the way the criminal law system generally operates. And there is a difference between things that happen and things that are attempted but don't happen. And I suppose the reason is that people who accomplish what they're trying to accomplish are more dangerous than the people who are incompetent and don't. So there's also an attempt to discourage following through or making sure it does happen. So this would be a real oddity in terms of the way the criminal justice system generally operates, as illustrated by what everyone thinks of the commentary, the provision that discounts for attempt solicitation and conspiracy because it didn't happen. I think you're absolutely right, Your Honor. And I think it is kind of a sticky issue. I think fortunately here, you don't really need to get into it because the actual loss calculation is not an issue. And the court did use the more conservative way of calculating intended loss. The only question is, was it allowed to calculate intended loss at all? So I think you can leave for another day exactly how to unpack the proper way to calculate intended loss. Here, it's just, do you get to do it at all? I'm saying it seems to me to be inherent in the whole notion that intended loss is lost because in general, the criminal law system doesn't operate that way. I gather it was perhaps put in to deal with sting operations where there was no actual loss, although the person did everything they could to cause the loss. It just happened that the victim wasn't really a victim. That's a somewhat different situation from where they didn't actually carry out their intent because of things that happened that were maybe outside their control or not. But still, that loss didn't happen even hypothetically or even contingently. Understood, Your Honor. I mean, I'll submit that I do think that intended loss as a measure of loss makes some sense given that, you know, the loss provision and really the guidelines as a whole are trying to measure culpability. And you are obviously more culpable if you intend to cause much greater harm than if you intend to cause less. How long has this intended loss been a part of the guidelines, either in the guidelines themselves? It was originally in the guideline, but then it was put into the commentary. How long has this approach been used? I believe it's always been in there. So I think 87. According to something that was written, it was in the guideline itself for about a year and then taken out and put into the commentary. That's correct, Your Honor. And as the, you know, notes that we site show, that was never with the intent that loss means something other than actual or intended loss. I think if it did mean that, then that commentary wouldn't have been included right at the same time that, you know, it was moved over to the commentary from the text. It just would have been eliminated from the commentary. So that's just another piece of contextual evidence that I think tends to support the conclusions that this provision either includes intended loss or is at least ambiguous such that you would defer to the Sentencing Commission. And then I'll simply note that if you are on plain error review, the courts are in full alignment. You have two published cases and one unpublished case that all say there's no plain error here. I see I'm over my time. I'm happy to address the other issues if the court would like me to. Otherwise, I can stop. Let me see if my colleagues have further questions for you. Okay. Mr. Howell, I want to thank you for your argument. We've let you go a little over. So I'm going to ask your opposing counsel, Mr. Gunn, to come up. And Mr. Gunn, let's hear from you for two minutes, please. All right. Thank you. Just to touch on maybe the last point first is, you know, it was in the actual guideline, as Judge Berzon indicated, for about a year. And ever since then, it's been in the commentary. But think of all the times the fraud and larceny guidelines have been amended in the meantime. And this was never part of the guideline in the process of any of those amendments. I'm sorry. Because of Stinson, there was no particular reason to put it in the guidelines because it was going to be followed anyway. I mean, it's kind of a strange situation because it does seem if they really meant it, they would have left it in the guidelines. And yet, given the structure at the time, there was no particular reason to. And Your Honor, I think makes a very good point that it really doesn't make sense in the context of 2X1.1, which recognizes the traditional criminal law principle that while attempts should be punished, unsuccessful attempts should be punished less harshly for the various policy reasons you articulated. I wanted to also go back to 1B1.3. Even if we don't look at that application note that I pointed out, I think the best reading of 1B1.3 in context is you have a reference to harm that results from the offense and a reference to the harm that's the object of the offense. The reference to harm that's the result of the offense is for substantive guidelines like 2B1.1 where actual harm happens. And the reference to harm that's the object of the offense is for 2X1.1 because 2X1.1 clearly looks at intended harm. And the commentary is exactly consistent with that. The commentary basically says, yeah, for actual harm, you're looking at the guidelines. And for intended harm, you're looking at 2X1.1. And the other thought here is if you interpret it the way the government's suggesting, 1B1.3, I think it makes 2X1.1 completely irrelevant. Because if you're always going to look at intended harm when you apply the substantive guideline, you'd never need 2X1.1. The final point I wanted to make is- Well, you would if the underlying crime was attempt. I mean, here he was convicted of actually carrying out something. It wasn't an attempt only. Or a conspiracy only. But- Maybe it wouldn't completely get 2X1.1, but it would certainly come pretty close, I think. But the other point I wanted to make, Your Honors, is he talked about the dictionary definitions in banks. I'm not going to sit here and read them all to Your Honor, but go look at them. I don't see anything in there that incorporates intended loss. I've never seen any dictionary definition that would take my hypothetical about the that was a loss. Right. But, I mean, the dictionary definitions may be part of this. I think the argument that's being made on the other side is you have to look to the broader context of the guidelines and the history. And in this case, we have a provision that's been recognized as including intended loss for some number of decades. And we have 1B1.3. And we have a purpose of trying to put an appropriate punishment to an offense, which, of course, a district court can depart down from and reduce if he thinks or she thinks that it's not appropriate. But I think it's not just dictionary definitions. It's the whole piece. Well, that's true, Your Honor. But the whole piece here is really just the, well, first of all, the whole piece here includes 2X1.1, which recognizes you reduced by three levels for unaccomplished offense conduct. And second of all, it just because something's been in the commentary forever doesn't all the rule about commentary inconsistent with guidelines not being treated. Really, basically, what we have here is something that was in the commentary forever, except for the first year. And I don't think having it in the commentary forever changes the rule. The rule is that commentary can't modify guidelines. And there's good reasons for that because guidelines have to be approved by Congress and get passed through Congress and so on. You know, the guidelines are different than commentary under the Stinson Act. I know you're over time, but one thing that's mystified me about all this is that I'm not so sure that Stinson and Kaiser are really different in this regard because Stinson said that if it wasn't consistent, then you don't apply it. And Kaiser says it has to be ambiguous. But it can't be if it's... I'm sorry, Your Honor. Just a minute. And the reason this is pertinent is because we don't have any case that ever actually did a Stinson analysis, as I understand it, of the intended loss, but we applied it regularly. Is that right? Yes. So the question is, what's changed, really? That's a practical matter. I think Stinson and Kaiser are different, Your Honor, though you can maybe reconcile the two. It's sort of almost like a burden of proof thing, or the level of the threshold. I think what Stinson basically said is the commentary controls unless it flatly contradicts the guideline. So it looks at the commentary first and then compares it to the guideline. What Kaiser really says, as I read Kaiser, is you don't even look at the commentary unless you find the guideline ambiguous. So with Stinson, you didn't need to find loss ambiguous. You just could look to the commentary that said it included intended loss and say, well, that's just the definition that defines loss in a strange way. With Kaiser, you look at the word loss and the context, maybe like that there's a 2x1.1 to deal with intended defense conduct. So I think in that sense, that's what I guess I'd suggest the difference is between Stinson and Kaiser. That it's flatly inconsistent. That is your position. I'm sorry, Your Honor? Your position is that it is flatly inconsistent. Well. The position is that loss doesn't mean an intended loss. It can't mean intended loss. It's just incorrect. It doesn't mean it. Yeah, except to the extent that sometimes courts and legislative bodies define words in ways that are different than the ordinary meaning. But yes. I don't think anyone ever, I don't know if there's a case that actually considers and addresses the issue of whether, quote, intended loss, unquote, flatly contradicts the word loss. I have one last question. And I know you're well over your time. Mr. Hackett was, in fact, sentenced well below the guidelines. So I know that that doesn't matter. We're supposed to send it back anyway. But as a practical matter, was he sentenced to what would have been the actual loss amount? Or, I mean, how does it relate to what he was actually sentenced to? And what the guideline would be if he looked at actual loss? Well, actual, that will depend on how the district court determines actual loss and remand. It could be less. His guideline range was 70 to 87 months. And I believe it would go down to 46 to 57 months if the loss calculation goes down by four levels. I don't have my guidelines book in front of me. I think if it got into the some hundreds of thousands of dollars, he'd be at a guideline range where the 46 months was right in it. If he got down below $100,000, for example, in a later restitution order, the court found the restitution amount owed was $67,000. So if the actual loss went that low, the guideline range would go lower than the 46 months. It also may be that sometimes courts tie their variances or departures as a sort of number of levels below the offense level. So the judge might give him the same variance, you know, to the new offense level, depending on how the judge was thinking. There's also, of course, the role in the offense issue. If you combine that, it is going to get him for sure under the 46 months. Okay. Well, I think we've let you go over, Mr. Gunn, but this was very helpful. I want to thank both counsel for the briefing and argument. We appreciate it. This matter is submitted.
judges: BERZON, RAWLINSON, BRESS